UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

FRED EHRLICH,

                    Plaintiff(s),

        -against-

ALFRED A. GATTA, as the Village Manager
of Scarsdale, WALTER J. HANDELMAN as
the Mayor of Scarsdale, JOHN A. BROGAN as
Scarsdale Police Chief, and the VILLAGE and
TOWN OF SCARSDALE,

                    Defendants.

-----------------------------------------------------------------X

Index No.  07 CV 11597
           (SCR)

ECF Case

**BARISH DECLARATION
IN OPPOSITION**

WILLIAM L. BARISH declares pursuant to 28 U.S.C. § 1746 as follows:

1. I represent plaintiff Fred Ehrlich, and submit this declaration in opposition to the motion of the Village of Scarsdale and its co-defendant officials, "the Village," for judgment on the pleadings and dismissal of the complaint as moot.

2. As explained in the accompanying Ehrlich declaration, and in the complaint at Village Exhibit A, the Village provides all-day, un-metered commuter parking at the Freightway Garage, "Garage," to residents who purchase Freightway Garage Permits, "FG Permits." Ehrlich Declaration, "Ehrlich," ¶2. The Garage is a multi-story parking structure located a healthy walking distance from the Station. A picture of the Garage is Exhibit 1 hereto. Ehrlich has had an FG permit since the Garage opened. Id.

3. In 2004 Ehrlich was injured in an accident that limited his ability to walk very far or stand very long. Ehrlich ¶3. The Village issued a handicap parking permit to Ehrlich on account of his injuries, and for the 44 months preceding this action Ehrlich

tried to convince the Village to provide enough handicapped commuter parking at the

Station so he would have access to the platform. Ehrlich ¶¶5-7, 11.

4. The Village belatedly moved its five handicapped commuter spaces to

the Station 22 months after Ehrlich first requested it. Ehrlich ¶6. However, five spaces

weren't sufficient to accommodate the handicapped commuters. The handicapped

commuter spaces were often occupied when Ehrlich arrived at the Station to take a train

to work. Ehrlich ¶10. He often had to park at a metered space at the Station, and often

received parking tickets. Id. He requested that the Village increase the number of

handicappedcommuter spaces. Ehrlich ¶11. The Village would not accept his telephone

calls, respond to his letters, or meet with him. Ehrlich ¶¶11-12. Approximately one year

after Ehrlich first advised the Village in writing that more handicappedcommuter parking

was needed, he filed this action. Having issued both the handicapped permits and FG

permits to its handicapped commuters, the Village was in a position to know how many

handicapped commuter spaces it should have provided. It claimed not to know.

5. I tried to resolve Ehrlich's claims with the Scarsdale Village attorney,

Esannason, both before suit was filed and afterwards. I asked him whether the Village

kept a list of its handicapped commuters – the people to whom it had issued both

handicappedparking permits and commuter parking (FG) permits. He said no. On

another occasion, I asked him why the Village would not simply provide additional

handicapped commuter spaces at the Station to accommodate Ehrlich. He said, "because

we don't have to." A few weeks later, when this case hadn't been settled, the Village

added two additional handicapped commuter spaces at the Station.

6. Nevertheless, nothing in its motion papers indicates that the additional spaces will remain. The Village is free to shove handicapped commuters back to the Garage once the valet parking there is discontinued. It has never conceded that handicapped commuters are entitled to park at the Station, and suggests that handicapped commuters may appropriately be made to wend their way to the Station from the Garage. For handicapped commuters, the trip is more than twice the distance claimed in paragraph 3 of the Sarnoff Affidavit.

7. An aerial photograph of the areas on the west side of the tracks at the Station is attached at Exhibit 2. I measured the distance along the village sidewalks from the Garage entrance to the handicapped entrance ramp at the Manhattan-bound platform at 735 feet. The route is marked by the dotted line on the photograph. The shortcut Sarnoff describes as 300 feet long, runs through a parking lot and over two steep, uncovered stairways. The stairways are on each side of Popham Road which bridges the tracks between the Station and the Garage area. Photographs of the stairways are Exhibit 3.

8. Both sides of the Station building contain parking. In addition to the Garage, the Village offers parking on the west side of the tracks at the large lot next to the Garage and at on Depot Place, the cul-de-sac where the handicapped parking is currently located. Depot Place presently contains five metered 90 minute spaces; ten metered 12 hour spaces, and the seven handicapped commuter spaces.

9. The Village also controls a large parking plaza on the east side of the tracks. It appears to have parking spaces for well-over 100 cars. Most of the spaces have 90 minute meters. Some 22 spaces have 12 hour meters. A picture of the plaza area is Exhibit 4 hereto. According to the MTA's information sheet at Exhibit 5, the Village has 699 parking spaces, in all, for the Station.

10. While refusing to add additional handicapped commuter parking at the Station in 2007, the Village was reserving spaces there for a non-handicapped group whose interests the Village apparently found more compelling. I inspected the Station shortly before Ehrlich filed suit when there were five spaces at Depot Plaza reserved for handicapped commuters. There were also two or three spaces marked "reserved for Freightway Garage personnel." FG personnel were afforded parking at the Station, while handicapped commuters were relegated to the Garage.

11. The Village contends that since it has added two additional handicapped commuter spaces and complied with the Building Code, there is supposedly sufficient parking for Ehrlich and other handicapped commuters now and forever more. In light of this epiphany, it maintains that Ehrlich's claims are moot.

12. It is not clear that the parking is now sufficient. Ehrlich's recovery from his February surgery has been slow. Ehrlich Dec. ¶¶3&4. He has been working from his home. There has been no discovery and the Village has not revealed how great the demand for handicapped commuter parking is. The Village has not provided its lists

of FG permit holders and of handicapped permit holders. Moreover, this action can not be considered moot so long as Ehrlich's claim for damages remains unresolved.

13. This case should not be considered moot in any event. Where a party has voluntarily modified the challenged policies, the court may declare the case moot only "if subsequent events make it absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000). What is clear is that the Village has been blind to the needs of its handicapped commuters, deaf to their requests, and resistant to the laws that protect them.

14. Even now, the Village acknowledges no obligation under the ADA to handicapped commuters. See Rice affidavit ¶21. It apparently has no procedure for determining the needs of its handicapped commuters and little interest in what they might be. The individualized approach to accommodating the handicapped that is mandated by the ADA, encompasses something more than ignoring their letters, and fining them for parking at spaces so that they can reach the platform.

15. If the court is nevertheless inclined to dismiss the complaint at this time, it should enjoin the Village from reducing the number of handicapped commuter parking spaces or removing any from the Station (i) prior to conducting a public hearing on three weeks prior notice to the residents with both handicapped and Freightway Garage permits and to members of the Village's Handicapped Advisory Committee, or (ii) prior to obtaining leave from this court.

16.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 4, 2008

_____
William L. Barish
WB 6105

II.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
FRED EHRLICH,

                Plaintiff(s),

    -against-

ALFRED A. GATTA, as the Village Manager
of Scarsdale, WALTER J. HANDELMAN as
the Mayor of Scarsdale, JOHN A. BROGAN as
Scarsdale Police Chief, and the VILLAGE and
TOWN OF SCARSDALE,

                Defendants.
-------------------------------------------------------------x

Index No.  07 CV 11597
(SCR)

ECF Case

**EHRLICH DECLARATION
IN OPPOSITION**

FRED EHRLICH declares pursuant to 28 U.S.C. § 1746 as follows:

1. I am the plaintiff in this action. I have lived in the Village of Scarsdale, and commuted to work from the Metro-North rail station in Scarsdale, "the Station," for about thirty-five years. I submit this declaration in opposition to the motion of the defendant Village/Town and its officials, collectively "the Village," for judgment on the pleadings, and to dismiss the complaint as moot.

2. The Village controls a large, multi-tiered parking structure known as the Freightway Garage, "the Garage," located about two or three blocks from the Village Station. The Village provides all-day, unmetered parking at the Garage to residents who purchase permits, "FG Permits," from the Village for such parking. Almost all, if not all, of the Village residents who need all-day parking near the Station are rail commuters. I have had an FG Permit ever since the Village built the Garage.

3. Four years ago when I was 71 years of age, I was struck by a bus and injured. I was hospitalized at Bellevue and Rusk Rehabilitation Hospital for 35 days.

Thereafter I was totally disabled for at least two months. I remained unsteady on my feet and developed a left foot drop. By reason of the left foot drop, I fell on a number of occasions and experienced excruciating pain. I had a laminectomy and facetectomy in May 2005 at NYU. By reason of various complications I was hospitalized for 22 days.

4. After a period of time I returned to work and developed a lumbar stenosis, which was resistant to various therapies. Although I was in pain, I worked full-time. On February 13, 2008, I underwent a second laminectomy to relieve the pain and, as a result of complications, I was hospitalized at White Plains Hospital and received extensive rehabilitation at Burke Hospital. I am currently recovering from the various injuries that I sustained and plan to return to work.

5. In 2004 or 2005, the Village issued a handicapped parking permit to me which I've renewed, together with the FG Permit, to date. (For convenience I will refer to those permits together as a "handicapped commuter parking permit." ) My wife drove me to the Station a number of times before I was able to drive. When I drove myself to the train for the first time after my first accident, I was shocked to see only one parking space for handicapped commuters. It was in the lot next to the Garage, and it was occupied. I advised the mayor of Scarsdale of this problem in my March 9, 2005 letter at Exhibit 7, wherein I stated: "As a direct result of the lack of permit parking and disability parking I was compelled to leave my car at a meter on the top of the garage and was caused to hobble an inordinate distance." I further stated that " permit parking should be made available precisely at the train station itself...." The Village did not respond to my letter.

6. My wife and I later met with the Assistant Village Manager, Sarnoff. In the course of the conference, the Village Manager spoke with the Village Attorney and informed me that the Village of Scarsdale had an obligation to provide nine handicapped spaces. He didn't tell me where he was going to put those spaces; I assumed it would be at the Station. Sarnoff told us that the Village would have to publish a notice in the Scarsdale Inquirer before he could add any handicapped parking. He said it would take a few weeks. Approximately four months later, the Village converted five spaces on the ground floor of the Garage to handicapped parking.

7. I used the parking spaces for a number of months. I wrote to Mr. Sarnoff by letter of August 2006 at Exhibit 8. I said in my letter, "I fail to understand why disability parking is not made available close to the train station." It was becoming painfully obvious to me that the Garage was too far from the Station for me to walk without experiencing additional difficulties and taking unwanted risks, especially when the weather was bad or my briefcase was full. Some time later the Village began renovating the Garage. In order to accommodate construction, particularly of a condo, the Village reduced the number of parking spaces in the Garage and instituted valet parking, which was apparently open to the public for a fee.

8. I continued to park in the Garage during the renovation. Finally, I was told by an employee who was involved in the renovation that I could no longer park there and that the Village had provided parking spaces at the Station. I drove to the Station and found that there were five handicapped parking spaces at the Station with a sign saying it was for handicapped parking for permit holders only. The Village, however, had failed to

remove the meters.

9. Initially most of these spaces were unused when I arrived at the Station to catch my train. But, as before, over time, the new parking spaces became increasingly popular. It became evident that five spaces were not enough.

10. Because of my health problems, I usually arrived at the Station between 9:30 a.m. and 10:00 a.m. where I caught the 9:40 or 10 o'clock train. By then, more often than not, the five spaces were occupied. Since I wished to catch the train, I would park at one of the two metered handicapped space nearby, which were always available. Even though I had a handicapped commuter permit, I received parking tickets for parking at the meter. I felt I should not have to pay them since I had paid for my FG Permit. I believed then, and now, that the Village was obligated to provide suitable handicapped parking for me.

11. I protested receipt of the tickets to the Village both by speaking to Mr. Sarnoff and by letter. Whenever I received a ticket, I sent my objections to the Village Manager's office. In letters dated January 29, 2007, April 10, 2007, June 18, 2007, June 20, 2007, July 26, 2007, and November 2, 2007 at Exhibit 9, I explained that I felt the tickets were improper, and indicated that there were too few handicapped commuter spaces at the Station. In the letters I repeatedly asked the Village why it would not add more spaces. I never got an answer. Interestingly enough, though, when I first started driving to the trains after my accident, Sarnoff told me that the Village was supposed to have 9 handicapped spaces for Garage parking.

12. My tickets were routinely dismissed by the Village Court as a result of communication from the Village Manager for a time. I was advised by the Village Court Justice that this was the last ticket he would dismiss unless I obtained a letter from the Village Manager authorizing my parking at the meter. This notation was contained in the Notice dismissing the ticket. I tried to speak to the Village Manager, but he would not take my telephone calls. My wife and I tried to meet with him but were always told he was "in conference" when either of us went to his office.

13. It was infuriating. In New York City, I could park without penalty, at most "No Parking" zones; at parking meters without depositing coins; and, except specified hours, at "No Standing, Trucks Loading and Unloading" zones with the handicapped permit it issued to me. In Scarsdale, where I have lived for half a lifetime, I could not find parking close enough to the Station, and the Village would not so much as speak with me about it. There was nothing I could do but bring this action.

14. Having ignored my requests for additional parking at the Station, my calls, and my letters for a full year, the Village maintains that my claims are now moot because it was inspired to add two handicapped commuter spaces at the Station soon after it was served in this action. I don't know if the seven existing spaces will suffice. I didn't start working again until several months after my latest surgery, and have been working from home since then. I intend to go to work in my Manhattan office. I further understand that the legal requirement for handicapped spaces is nine.

15. Even if seven handicapped commuter spaces will currently suffice, there

-5-

is little reason to trust that the Village will ensure, voluntarily, that sufficient handicapped commuter parking will be provided going forward. The number of handicapped commuters needing parking changes over time. Nothing the Village has done in the past or stated in the affirmation of Sarnoff or his attorney in the Village's motion papers establishes that the Village will be any more interested in protecting the interests of its handicapped commuters in the future than it has been in the past.

16. The motivating spirit for the Village in connection with handicapped commuter parking has been expedience. When I was first injured, it had only one handicapped space for its commuters, even though the state law requires nine in connection with the Garage alone. When the Village determined that five additional handicapped commuter spaces were required, it waited approximately four months to provide them. Apparently for revenue purposes it put the handicapped spaces in the Garage rather than providing nine handicapped spaces at the Station so that a handicapped person could utilize the Station without difficult or danger.

17. When the Village finally saw fit to allow handicapped commuters to park at the Station, the impetus was not a new humanitarianism. Notwithstanding their knowledge that state law required them to put handicapped commuter parking as close as possible to the commuter trains, a requirement confirmed at pages 2-3 of its memorandum, eighteen months after receiving my letter requesting it, the Village finally put handicapped commuter parking at the Station because it had to move the spaces it had created and couldn't find another place in the Garage to put them. Sarnoff Aff'd ¶ 10. Sarnoff specifically stated that "the professional staff was of the opinion that ... [it] would be more

convenient if they were placed located [sic] close to the in-bound platform." Id.

18. Perhaps most telling of all, during the period it was issuing parking tickets to me at the Station, and I was demanding that it provide additional parking at the Station for handicapped commuters like me – residents with both handicapped permits and Freightway Garage permits, the Village was holding two or three parking spaces at the Station, adjacent to the southbound platform, in reserve for "Freightway Garage Personnel." Barish declaration ¶5. At all relevant times, the Village had ample space at the Station for nine parking spaces for disabled persons with permits. The Village merely had to reduce the metered parking at the Station.

19. In sum, the Village did not moot this case by providing two new spaces. Nothing the Village did could impair my claim for damages. The seven spaces now at the Station are fewer than the number that state law requires for the Garage. The Village has provided no discovery indicating the number of handicapped commuter parking permits that are outstanding.

20. If this action is dismissed as moot, the Village will remain at liberty to arbitrarily move handicapped commuter spaces back to the Garage, or reduce their number, or ignore the need for additional spaces. Adding two spaces after being sued hardly demonstrates a willingness by the Village to comply with the ADA. Indeed, the Sarnoff Affidavit seems to deny that the ADA is applicable in this case. Even if its parking program currently complies with the anti-discrimination laws, the Village should not again be allowed unfettered discretion over parking for the disabled.

21. In all events, the court should direct that the Village may not reduce the number of handicapped commuter spaces at the Station without first obtaining leave of court or without first holding a hearing on three weeks written notice to each handicapped commuter – each person to whom it has issued both a current handicapped permit and a current Fairway Garage permit – and to each member of the Scarsdale Advisory Counsel for People With Disabilities.

22. I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 29, 2008

Fred Ehrlich

-8-