UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
FRED EHRLICH,

                    Plaintiff,

        -against-

ALFRED A. GATTA, as the Village Manager
of Scarsdale, WALTER J. HANDELMAN as
the Mayor of Scarsdale, JOHN A. BROGAN
as Scarsdale Police Chief, and the VILLAGE
and TOWN OF SCARSDALE,

                    Defendants.
-------------------------------------------------------------x

Index No.
        07 CV 11597 (SCR)

ECF Case


**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
UNDER RULE 12(C) AND FOR MOOTNESS**


Part 2 of 2


William L. Barish
Attorney for Plaintiff
30 Glenn Street
White Plains, New York 10603
(914) 285-9471   WB 6105

tenant by providing parking for her ahead of other tenants on a long waiting list[6].

## C. THE COMPLAINT PROPERLY ALLEGES CAUSATION.

At page six of its memorandum, the Village asserts that the complaint must allege that Ehrlich was unable to obtain access to the Station "solely" because of his disability. Cited in support are cases from other jurisdictions. In the Second Circuit, a claim under the ADA is sufficient if the disability is a substantial factor in the loss complained of. See *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279& 291 (2d Cir 2003), *cert. denied*, 541 U.S. 936 (2004); *Meekins v. City of New York*, 524 F. Supp.2d 402, 410 (S.D.N.Y. 2007)

At any rate, the complaint fairly indicates that the only reason Ehrlich can't commute from the Station without penalty is his disability. Were he not disabled, Ehrlich could park at the Garage and walk to the trains with the able-bodied commuters. But to access the train platforms, he must park close enough to walk there without excessive risk, pain or difficulty.

## D. THE VILLAGE MISCHARACTERIZES THE COMMUTER PARKING PROGRAM.

The Village erroneously insists that Ehrlich seeks the right to park wherever he wants, and, as a consequence, mischaracterizes the benefit at issue. The Court warned against such maneuvers in *Alexander v. Choate*, 469 U.S. 287, 301-02 (1985), when it said, "The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are

---

[6] Although the action was brought under the Fair Housing Amendments Act, the Second Circuit confirmed that the anti-discrimination provisions of the FHAA involved the same "reasonable accommodation" standard as section 504 of the Rehabilitation Act, *Cadman Towers*, supra, 51 F.3d at 334-335, and, accordingly, Title II of the ADA.

entitled ...."

That is what the defendant City of New York attempted in *Meekins v. City of New York*, 524 F. Supp.2d 402, 410 (S.D.N.Y. 2007). There, a New Jersey resident challenged the City's policy of issuing handicapped parking permits only to persons who lived, worked or studied in the City. The court found that the relevant benefit from which plaintiff was excluded was not participation in the City's parking program, but access to the City's cultural, medical and similar institutions. *Id*. There, as here, handicapped parking was not the benefit; it was the remedy.

Since the Village offers commuter parking, handicapped commuters are entitled to parking accommodations permitting them meaningful access to the Station. If the Village did not offer commuter parking to its residents, it would have no obligation under the ADA to offer accessible commuter parking to its handicapped residents. There would be no policy, practice or procedure to modify for the benefit of its handicapped residents. That is the holding of two of the cases at page five of the Village's memorandum[7].

In *Kornblau v. Dade County*, 86 F.3d 193 (11th Cir. 1996) and *Douris v. Newtown Borough, Inc.*, 207 Fed. Appx. 242 (3d Cir. 2006) the benefit at issue was free, no-permit parking available to the public-at-large and not provided in aid of a particular service, program, or activity. In each case, the disabled plaintiff was able to use the parking as effectively as other drivers. In each case, the plaintiffs claimed the right to park as close as possible to locations of their choosing.

Douris wanted to park his car in the "no parking" zone on the street next to his

---

[7] The Village cites a third case, *Kelly v. Rice*, 375 F. Supp.2d 203 (S.D.N.Y. 2005), for the principle that the police do not necessarily violate the ADA by issuing parking tickets to drivers with handicapped parking permits.

parents property. Kornblau wanted to leave her car all day, in a one-hour lot adjacent to the building where she worked instead of the 12-hour lot two blocks away. Both actions were properly dismissed, both cases are inapposite.

### Point II

### THE COMPLAINT STATES A CLAIM UNDER
### THE NEW YORK HUMAN RIGHTS LAW

New York's principal anti-discrimination statute is the Human Rights Law, "HRL," published at Article 15 of the Executive Law. It is similar to the ADA, but defines disability more broadly. See *Almond v. Westchester County Department of Corrections*, 425 F. Supp.2d 394, 401-02 (S.D.N.Y. 2006).

Section 296(2)(a) of the Executive Law provides that the owner of a public accommodation shall not "directly or indirectly, ... refuse, withhold from, or deny" such accommodation on account of disability. "Public accommodation" under the HRL includes "garages, [and] all public conveyances ... as well as the stations and terminals thereof," §292(9), and includes municipal facilities.

The HRL confirms that discrimination includes a "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services ...." Executive Law §296(2)(c)(ii). It also confirms that the "discrimination" barred by the HRL encompasses a refusal to make reasonable modifications "when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities ...." Executive Law §296(2)(c)(i).

The complaint states a cause of action under state law.

-12-

## Point III

## THE BUILDING CODE IS IRRELEVANT

The Village maintains that its sole obligation to handicapped commuters is set forth in the New York State Uniform Fire Prevention And Building Code, the "Building Code" excerpted at Village Exhibit C, which supposedly "implements the mandate of the ADA." Village Memorandum at 2. The Village claims that it has complied with the Building Code, and therefore the ADA, by placing seven handicapped commuter spaces at the Station[8]. The argument is frivolous.

The Building Code covers "the design and construction of facilities for accessibility[9]." §1101. It does not purport to establish the post-construction obligations of an owner, or allow private enforcement actions.

The language of the Building Code that allegedly supplants title II of the ADA, is, itself, found in the ADA. Like section 1106.1 of the Building Code, Section 4.6.2 of the ADAAG directs that the design for parking lots with 401 – 500 spaces include 9 handicapped spaces.

There is no conflict between the Building Code and the ADA. If there were, the

---

[8]  At page three of its memorandum, the Village opines:

> by providing seven of the nine handicapped spaces immediately
> adjacent to the train station, the Village has implemented the intent
> of the ADA by providing more than 75% of the required
> handicapped parking spaces at the closest possible location.

[9]  Section 1101 goes on to direct that facilities be designed and constructed to provide accessible parking. Section 1106 decrees that "the number of accessible parking spaces shall be determined based on the total number of parking spaces provided for the facility" long before the needs of tenants, employees, or permittees are knowable. It requires that nine accessible parking spaces are created for a parking facility with 401– 500 spaces, §1106.1.

The accessible parking must be situated as close as possible to the building served. §1106.6. The Village's justification for locating two handicapped commuter spaces at the Garage remains unexplained.

ADA would control. The ADA supercedes narrower anti-discrimination provisions of state law. See 42 U.S.C. §12201(b).

The Village's claim that the Building Code controls the ADA is further undercut by other provisions of New York Law. Even if the Building Code were found to conflict with the HRL, the HRL would prevail. Statutes trump regulations. Moreover, the recent amendment to the HRL adding Executive Law section 296(2)(c) further confirms that the Village's construction of the Building Code is plainly wrong. The HRL obligates the Village to accommodate disabled persons. That is also what the ADA requires and what the Village maintains it need not do by virtue of the Building Code. Nothing in the Building Code bars Ehrlich's claims.

## Point IV

### EHRLICH MAY RECOVER COMPENSATORY DAMAGES INCLUDING DAMAGES FOR EMOTIONAL DISTRESS

As the Village indicates at page six of its memorandum, damages under the ADA are recoverable in the Second Circuit upon a showing of intentional discrimination. The Village maintains Ehrlich failed to plead it[10]. The Village also maintains that, under the ADA, Ehrlich can not recover damages for emotional distress as claimed in paragraph 54 of the complaint.

---

[10]  Specifically, the Village claims at page eight of its memorandum that "the complaint is devoid of any allegations to substantiate Plaintiff's bold and factless allegation that the defendant intentionally discriminated against him."

## A. THE VILLAGE HAS BEEN DELIBERATELY INDIFFERENT TO THE NEEDS OF ITS HANDICAPPED COMMUTERS.

To establish intentional discrimination, Ehrlich need not show that Village personnel hated him or wished him harm.

> [I]intentional discrimination against the disabled does not require personal animosity or ill will. [citations omitted]. Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result .... [citation and quotation marks omitted]

*Bartlett v. New York State Board of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998), vacated on other grounds and remanded, 527 U.S. 1031 (1999) (mem.).[11]

The factors considered include the background for the practice, decision or policy, the defendant's criteria, and the discriminatory impact. *Tsombanidis v. West Haven fire Department*, 352 F.3d 565, 579-80 (2d Cir. 2003). The facts of this case suggest that the Village was knowingly and deliberately indifferent to Ehrlich's rights under the ADA.

* The Village failed to acknowledge the requests Ehrlich made in eight letters to the Village over a one year period that it provide sufficient handicapped commuter parking.

* The Village Manager refused to return Ehrlich's calls or to meet with him.

* The Village rushed to install more handicapped commuter parking at the Station after this suit was filed.

* Despite Ehrlich's letters in 2005 and 2006, the Village finally moved its handicapped commuter parking to the Station only when it could no longer remain at the Garage.

---

[11] The later decision in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), cited at page seven of the Village's memorandum, is not to the contrary. Plaintiff there sought damages under Title II of the ADA against the a state university which claimed immunity under the 11th Amendment. The court held that to recover from the State, plaintiff needed to establish that the alleged discrimination was motivated by ill will or animus based on plaintiff's disability – conduct proscribed by the 14th Amendment. The court emphasized that these restrictions do not apply to actions against non-state governmental entitles. 280 F.3d at 115.

\*     The Village never sought to determine how many residents held both its handicapped and its FG Permits.

\*     The Village still refuses to acknowledge that its handicapped commuter program must comply with the ADA.

\*     The Village still insists that its failure to provide sufficient handicapped parking is acceptable, relying on a frivolous defense dependent on an interpretation of the Building Code that is both clearly insufficient and patently wrong.

\*     The Village installed two handicapped commuter parking spaces at the Garage even though it concedes that the Building Code on which it relies, requires that they be located as close as possible to the facility they serve – the Station.

These factors more than suggest that the Village has been deliberately indifferent to Ehrlich's need for accommodations, and that it has been violating state and federal anti-discrimination laws for many years.

The Village asserts, at page eight of its memorandum, that Ehrlich cannot recover damages because its failure to provide sufficient handicapped commuter parking affects all disabled persons, not just him. Every discriminatory governmental policy necessarily affects groups of disabled persons, not solely the individual who sues to change it.

Here, the only person known to have been unable to access the Station due to a disability is Ehrlich. The handicapped commuters who arrive at the station before Ehrlich have been able to find parking. The Village has not disclosed whether other handicapped commuters have been suffering the same plight as Ehrlich. Having sold a commuter parking permit to Ehrlich, the Village has assumed obligations to him that do not extend to all other disabled persons.

## B. EHRLICH MAY RECOVER DAMAGES FOR EMOTIONAL INJURIES UNDER THE ADA.

Federal courts should not be quick to limit recoverable damages for a violation of civil rights laws providing a private cause of action for the aggrieved. "[I]t is ... well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 396 (1999) quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946) (footnotes omitted) see *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98, 111 (2d Cir. 2001).

Title II of the ADA provides especially broad rights to the disabled. See *Garcia*, 280 F.3d at 109-10.[12] Under the Title II, the handicapped have a personal right to reasonable accommodations meeting their individual needs. The causation formula for recovering damages under Article II is the formula applicable to negligence actions. N.Y. PJI 2:70. Aggrieved parties should be able to obtain damages that will compensate them for their losses, including emotional injuries. See *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986).

Accordingly, damages for emotional distress are recoverable in ADA cases in the Second Circuit. E.g. *Kuper v. Empire Blue Cross & Blue Shield*, 2003 WL 359462 (S.D.N.Y. 2003); *Fink v. City of New York*, 129 F. Supp.2d 511 (E.D.N.Y. 2001); *Equal*

---

[12] The Garcia court noted at 109:

> Title II allows but a single basis for not providing the accommodation: a showing that a fundamental alteration in the nature of the program, service, or activity would occur. See Thompson v. Colorado, 258 F.3d 1241, 1252 (10th Cir.2001) ("In contrast to the Equal Protection Clause prohibition on invidious discrimination against the disabled and irrational distinctions between the disabled and the nondisabled, Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf.").

claims for damages.  This action is not moot.

## B.  THE MOOTNESS CLAIM RAISES QUESTIONS OF FACT.

Whether the seven handicapped commuter spaces at the Station actually accommodate the handicapped commuters is unclear.  The number of handicapped commuters is unknown.  The Village has not disclosed whether it has received "comments" from handicapped commuters since adding two spaces at the Station.  Ehrlich has not resumed his normal work schedule, and is unaware whether the seven handicapped commuter spaces now at the Station are sufficient.  Ehrlich ¶14.  At the least, the Village's motion raises questions of fact.

## C.  THIS ACTION IS NOT MOOT BECAUSE  IT IS NOT ABSOLUTELY CLEAR THAT THE VILLAGE WILL COMPLY WITH THE ADA.

A defendant cannot destroy a federal court's power to determine the legality of a challenged policy by voluntarily renouncing it during the litigation.  Otherwise, the defendant could freely resume the challenged activities once the lawsuit ended.  The mootness issue is not whether the court can enjoin unlawful acts the defendant apparently abandoned after being slapped with process.  The issue is whether it should.  *City of Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

A defendant must meet a "stringent" standard to voluntarily moot an action.  In voluntary cessation cases, a claim may be deemed moot only "if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.  The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)

-19-

*Employment Opportunity Commission v. Deloitte & Touche, LLP*, 2000WL 1024700 (S.D.N.Y. 2000).  See *Sobel v. Community Access, Inc.*, 2007 WL 2076977 at 1n.2 (S.D.N.Y. 2007); *De La Cruz v. Guilliani*, 2002 WL 32830453 at 10 (S.D.N.Y. 2002); *Gilbert v. Hotline Delivery*, 2001 WL 799576 (S.D.N.Y. 2001); *Sharp v. Abate*, 887 F.Supp. 695, 699 (S.D.N.Y. 1995).

## Point V

## EHRLICH'S CLAIMS ARE NOT MOOT

At page one of its memorandum, the Village argues that it has mooted Ehrlich's claims by finally providing nine handicapped parking spaces for the 450 space Garage in accordance with the Building Code.  Seven are at the Station; two are in the Garage.  It maintains that by setting design standards for parking lots, the Building Code implements the mandate of the ADA, even though the ADA calls for individualized consideration of the needs of handicapped persons.

The Building Code is inapplicable, as demonstrated above.  The question is whether the presence of the two new handicapped spaces at the Station moots Ehrlich's ADA claims.  The answer is no.

## A. THIS ACTION IS NOT MOOT BECAUSE THE COMPLAINT CONTAINS A COGNIZABLE CLAIM FOR DAMAGES.

An action is not moot so long as a damage claim remains unadjudicated.  See *Town of Woodbury*, 445 F.3d 136, 150-51 (2d Cir 2006); *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98, 110 (2d Cir. 2001);  *Cook v. Colgate University*, 992 F.2d 17, 19 (2d Cir. 1993).  The second and fourth causes of action of the complaint sufficiently allege

-18-

(citations omitted).

## 1. THE VILLAGE CLAIMS IT IS EXEMPT FROM THE ADA.

It is absolutely clear that the only way that the Village will provide handicapped commuter parking in accordance with the ADA is inadvertently. The Village denies that the ADA governs Ehrlich's right to reasonable access to the Station. Ehrlich's experience suggests that the village lacks a sincere concern for its handicapped commuters. Its hard-hearted, meretricious claim that the Building Code preempts the ADA exemplifies its approach. Other examples abound.

When the Village had only one handicapped commuter space and concededly needed more, it waited four months to add them. Ehrlich ¶6. It failed to locate any handicapped commuter spaces at the Station notwithstanding the Building Code's requirements, Rice ¶19, until 22 months after Ehrlich first requested it. Even then, the Village moved the five handicapped commuter spaces to the Station because the spaces couldn't remain at the Garage due to renovations.

The Village further confirmed that it did the right thing for the wrong reason by explaining that spaces were relocated at the Station for the "convenience" of handicapped commuters. Sarnoff Affidavit ¶10. Although it refused to speak or meet or correspond with Ehrlich about the insufficient accessible handicapped commuter parking, Sarnoff found reason, after conferring with the Village Attorney, Sarnoff ¶19, to add two more spaces about one month after Ehrlich sued.

The Village never bothered to confirm how many parking spaces are needed to accommodate the handicapped residents to whom it sold commuter parking permits. Answer to Complaint ¶30; Barish ¶5. Nothing in its motion papers suggests that the

Village will make required accommodations. The Village's only concession to its handicapped commuters is in the peroration at paragraph 15 of the Sarnoff affidavit: "No change has or will be made to reduce the number of parking spaces below that required by the New York State Uniform Fire Prevention And Building Code." Scant comfort at best.

Absent a court order, Ehrlich may again be relegated to parking at meters; fighting parking tickets; and writing more letters for the Village to ignore.

## 2. THE COURT SHOULD DISCOUNT ANY BELATED VILLAGE CLAIMS OF FEALTY TO THE ADA.

Where, unlike here, the defendant concedes its error, its "predictable protestations of repentance and reform" should be viewed with skepticism. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation Inc.*, 484 U.S. 49, 67 (1987) (citation and quotation marks omitted). Even policy changes announced by senior officials ring hollow when sparked by litigation.

For instance, in *Hilton v Wright*, 235 F.R.D. 40 (N.D.N.Y. 2006), after suit was filed, a challenged policy was rescinded in writing by the associate commissioner and chief medical officer for the defendant DCS, the State Department of Correctional Services. Defendants moved to dismiss on grounds of mootness. The court found that the motivation for the policy shift was "questionable at best,"and that its timing – three days before DCS was to respond to plaintiffs' motion for class certification – was "significant." The court determined "the defendants have simply manufactured an argument of mootness." *Id.* At 47. Motion denied.

A motion to dismiss for mootness was also denied in *Tsombanidis v. City of West Haven*, 352 F.3d 565 (2d Cir. 2003). There, defendant's official testified at trial that he would no longer follow the challenged policy that had been established by his predecessor.

-21-

The court observed that any change of personnel, could bring another policy change. *Id.* at 574.

In *United States v. NYC Transit Authority*, 97 F.3d 672 (2d Cir. 1996), plaintiff challenged a policy that the president of the New York City Transit Authority, the TA, had rescinded five weeks earlier in writing. He testified at his deposition that the TA had no plans to reinstate it. The TA moved to dismiss the action as moot. The was denied. Although the policy had been modified three years earlier, the court noted that the defendant refused to enter into a consent decree unless it could reinstate the policy if it were upheld in other litigation. The court said it is "significant that the change of policy was initiated on the eve of the lawsuit. *Id.* at 676. See also *Yassky v. Kings County Democratic County Committee*, 259 F. Supp.2d 210, 214-15 (E.D.N.Y. 2003).

In this case, the Village added two handicapped commuter spaces at the Station after Ehrlich filed suit. It has not modified any policy concerning its handicapped commuters. Its policy is apparently to ignore them as long as possible. It denies having any obligations under the ADA. It remains free to exile its handicapped commuters back to the Garage. It clearly has no intention of increasing the number of handicapped commuter spaces in response to the needs of its handicapped resident commuters.

Ehrlich's claims are not moot.

## **CONCLUSION**

For the reasons set forth above, defendants' motion for an order granting them

judgment on the pleadings, and dismissing the complaint as moot, should be denied.

dated: July 23, 2008

August 13, 2008

William L. Barish, Esq.
Attorney for plaintiff
30 Glenn Street #201
White Plains, N.Y. 10603
Tel: (914) 285-9471
Fax: (914) 285-291
WB - 6105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

FRED EHRLICH,

                        Plaintiff,

            -against-                                    Index No.
                                                            07 CV 11597 (SCR)

ALFRED A. GATTA, as the Village Manager                    ECF Case
of Scarsdale, et al.

                        Defendants.
-----------------------------------------------------------x

## PLAINTIFF'S EXHIBITS: 1 of 3

1.      photograph of Freightway Garage;

2.      aerial photograph of the west side of tracks at the Station;

3.      photographs of Popham Avenue bridge stairways:
            from Manhattan-bound platform near stairs,
            from handicapped ramp at Manhattan-bound platform,
            from Pophan Avenue to Fairway Garage lot;

4.      photograph of handicapped commuter spaces at the Station;

5.      Metro North information sheet describing parking at Scarsdale
        Station;

6.      March 2005 Ehrlich letter to Scarsdale Mayor;

7.      8/06 Ehrlich letter to Assistant Village Manager;

8.      Ehrlich's 2007 letters to the Village.

**<u>EXHIBIT 1</u>**



Freightway Garage

Freightway Lot

# **EXHIBIT 2**



**EXHIBIT 3**



stairway from platform to Popham Road

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
FRED EHRLICH,

                              Plaintiff,

                                                          Index No.
          -against-                                       07 CV 11597 (SCR)

ALFRED A. GATTA, as the Village Manager                   ECF Case
of Scarsdale, et al.

                              Defendants.
-----------------------------------------------------------x

## PLAINTIFF'S EXHIBITS: 2 of 3

1.     photograph of Freightway Garage;

2.     aerial photograph of the west side of tracks at the Station;

3.     photographs of Popham Avenue bridge stairways:
           from Manhattan-bound platform near stairs,
           from handicapped ramp at Manhattan-bound platform,
           from Pophan Avenue to Fairway Garage lot;

4.     photograph of handicapped commuter spaces at the Station;

5.     Metro North information sheet describing parking at Scarsdale
       Station;

6.     March 2005 Ehrlich letter to Scarsdale Mayor;

7.     8/06 Ehrlich letter to Assistant Village Manager;

8.     Ehrlich's 2007 letters to the Village.





Stairway from Popham Road to the Freightway lot

**EXHIBIT 4**

handicapped commuter parking

**<u>EXHIBIT 5</u>**



**Metro-North Railroad**

**Schedules**      **Maps**      **Service Advisories**

MTA Home

NYC Transit

Long Island Rail Road

Long Island Bus

Metro-North Railroad

Bridges & Tunnels

Capital Construction

Bus Company

**Search**

FAQs/Contact Us


Accessibility Information




MAIL&RIDE
WebTicket

## SCARSDALE

### Location
1 Depot Place
Scarsdale, NY, 10583-3707
(19 miles to Grand Central Terminal)

### Train Service
HARLEM LINE    SCHEDULES

### Connecting Service
Operator: WCDOT Bee-Line    Tel.#: (914) 813- 7777
Route: 63, 64, 65, 66
Schedule: www.beelinebus.com
Fare: $1.75; UniTicket: $37.50/mo.

### Station Parking (**Scarsdale Parking**)
**Operator:** Town of Eastchester      Commuter Capacity   195
Tel.#: (914) 771- 3300
Free Weekend/Holiday Policy: Permit=No; Meters=Free Sun. & Hol.

**Daily Metered Information**

| Meter Type: | off-peak (Grayrock) | 12-hr (Garth Rd); Police operated. | *Off-Peak=>9:30AM |
|---|---|---|---|
| Comments: | None | | |

**Parking Facility/Area Locations**

**Operator:** Village of Scarsdale      Commuter Capacity   699
Tel.#: (914) 722- 1231
Free Weekend/Holiday Policy: Yes (meters in effect on Saturday), fee after 6:00 except Beatty lot.

**Daily Metered Information**

| Meter Type: | 12hr+$40 annual permit (garage roof & other lots) | 8-hr (Freightway Open Lot) |
|---|---|---|
| Comments: | None | |

**Parking Facility/Area Locations**

Please Note: Parking information is subject to change, customers should contact the parking operator for the most accurate information.

### Taxis
Scarsdale Taxi: (914) 723-0016. Cabs meet most trains.

### Accessibility*

WHEELCHAIR ACCESS: Ramps and/or elevator to platforms are available.
LIMITED ACCESS BETWEEN PLATFORMS: Route between platforms does not meet ADA requirements. Vehicular drop-off and/or pick-up is suggested.
NEAREST STATION WITH FULL ACCESS FOR PERSONS WITH MOBILITY, VISUAL AND HEARING IMPAIRMENTS: White Plains.

*FULL ACCESS stations comply with all requirements of the Americans with Disabilities Act and have accessibility features for persons with mobility, visual and hearing impairments. Accessibility at other stations is limited to the features listed.

## Elevator Status (Elevator status is subject to change without notice.)

| | |
|---|---|
| Elevator from the street level to the White Plains/Southeast-bound platform (Track 1). | working |

Click here for elevator status at other stations.

## Ticket Machines

Two ticket machines at this station. Two ticket machines are located in the shelter between the station building and the southbound platform (Tk. 2). Ticket machines accept cash, credit cards and debit cards.

## Ticket Office Hours

| Days | Open | LunchHours |
|---|---|---|
| Mon - Thurs | 6:10 AM - 1:30PM | 11:40 AM - 12:00 NN |
| Fri | 6:10 AM - 1:30PM | 11:40 AM - 12:00 NN |
| Sat | 8:00 AM - 3:20 PM | 12:35 PM - 12:55 PM |
| Sun | 9:00 AM - 4:20 PM | 1:15 PM - 1:35 PM |
| Holidays | CLOSED | |

## Get Driving Directions       MAP

Northbound:
From Bronx River Parkway Northbound Exit at Crane Road. At end of exit, immediately turn right onto East Parkway. Station is on the right.
Southbound:
From Bronx River Parkway Southbound: Exit left at Crane Road. At end of exit, immediately turn right onto East Parkway. Station is on the right.
Additional:
Between Popham Road and East Parkway

Station List

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
FRED EHRLICH,

                    Plaintiff,

          -against-                                    Index No.
                                                          07 CV 11597 (SCR)
ALFRED A. GATTA, as the Village Manager
of Scarsdale, WALTER J. HANDELMAN as                   ECF Case
the Mayor of Scarsdale, JOHN A. BROGAN
as Scarsdale Police Chief, and the VILLAGE
and TOWN OF SCARSDALE,

                    Defendants.
------------------------------------------------------------x

## PLAINTIFF'S EXHIBITS 3 OF 3

William L. Barish
Attorney for Plaintiff
30 Glenn Street
White Plains, New York 10603
(914) 285-9471   WB 6105

**EXHIBIT 6**

March 9, 2005

Mayor Sved
Village of Scarsdale
100-1 Post Road
Scarsdale, NY 10583

**Re: Scarsdale Train Station Parking**

Dear Mayor Sved:

I am a 72-year-old lawyer who has been residing at 41 Palmer Avenue in Scarsdale since 1972. I was recently involved in a serious bus accident in which I fractured my hip and was hospitalized for 35 days. I would like to bring the following problem to your attention.

I obtained a temporary disability permit for parking. I also have a permit for parking from the Village of Scarsdale.

Until today my wife has been driving me to and from the train station. Today I had to attend a matter in court in Westchester and when I arrived at the Scarsdale station at 11:10 a.m. there was no disability parking available nor was there any permit parking available. As a direct result of the lack of permit parking and disability parking I was compelled to leave my car at a meter on the top of the garage and was caused to hobble an inordinate distance.

Two problems should be addressed:

1.    Permit parking should be made available precisely at the train station itself, and

2.    Metered parking should not be made available when there are more permits issued than parking spaces available.

I had a similar problem before my injury when the parking garage was under construction and because of miscommunication I thought I could park at a meter where I later received a ticket. This caused me to attend two court sessions and a trial to have the ticket reduced.

Mayor Sved
Village of Scarsdale
March 9, 2005
Page 2

It would appear to me that the number of garage spaces and the permit spaces outside of the garage should first be made available to citizens of Scarsdale who have permits and that adequate disability spaces be made available in close proximity to the train station.

I also noted there were empty parking spaces for meters adjacent to the parking garage at the same time there was no permit space available and that there was only one space for disabled persons.

Obviously, the situation in the parking garage is not being handled appropriately both for the citizens of Scarsdale and for disabled persons.

Respectfully yours,

Fred Ehrlich

cc.:    Mr. Daniel Sarnoff
        Assistant to the Village Manager
        Scarsdale Village Hill
        1001 Post Road
        Scarsdale, NY 10583

        Scarsdale Inquirer
        14 Harwood Court, Suite 510
        Scarsdale, NY 10583

c:\clients\1-ehrlich\mayor sved 090904.doc

**EXHIBIT 7**

LAW OFFICES OF
# FRED EHRLICH, P.C.



LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: 212-370-5244 • FAX: 212-370-9145

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
tedkaplanesq@aol.com

August 21, 2006

OF COUNSEL
EHRLICH & FREEDMAN, P.A.
CORAL SPRINGS FINANCIAL PLAZA
3300 UNIVERSITY DRIVE, SUITE 527
CORAL SPRINGS, FLORIDA 33065
TEL: 954-755-0009
FAX: 954-755-0067

*By Facsimile 914-722-8315*

Village Manager
Village of Scarsdale
Scarsdale, NY 10583

> **Re:   Parking Disability Permit**
> **Fred Ehrlich**
> **41 Palmer Avenue**
> **Scarsdale, NY 10583**

Dear Sir:

After extensive discussions with your office you finally provided disability parking at the Scarsdale Parking Garage pursuant to the Americans with Disabilities Act.

Recently you have installed a booth at the parking garage and removed a disability parking space which is outside the parking garage. Cones have been placed to prevent ingress or egress to the disability spaces in the parking garage. Until now, I have been allowed to go into the garage to utilize the disability parking. I am informed, however, that the disability parking will be closed as of the end of this month.

What provisions, if any, have you made for disability parking? Please advise me immediately. Please call me at the above telephone number. Furthermore, I fail to understand why disability parking is not made available close to the train station.

Very truly yours,

Fred Ehrlich

\ehrlich\disability parking scarsd\villmgr 082106.doc

**EXHIBIT 8**

SCANNED
Jan 30, 2007

LAW OFFICES OF
# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: 212-370-5244 • FAX: 212-370-9145

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
tedkaplanesq@aol.com

January 29, 2007

OF COUNSEL
EHRLICH & FREEDMAN, P.A.
CORAL SPRINGS FINANCIAL PLAZA
3300 UNIVERSITY DRIVE, SUITE 527
CORAL SPRINGS, FLORIDA 33065
TEL: 954-755-0009
FAX: 954-755-0067

*By Facsimile and Mail*

Mr. Dan Sarnoff
Village Manager's Office
Village of Scarsdale
Post and Crane Road
Scarsdale, NY 10583

> **Re:    Information/Appearance Ticket #426555
> and Parking Ticket # S000422116**

Dear Dan:

I most appreciate your prompt advice to me as to the status of the condo development in the Village. It is much appreciated. I have faxed you earlier today the Delinquent Violations Notice sent to me by the Village of Scarsdale. I appreciate your intervention in this matter.

As you know, the Village moved the permit parking from the parking garage to the parking space beside the station on the southerly side of Metro North so that disabled persons in Scarsdale can utilize the train on a regular basis, presumably to attend their occupations in New York City.

As you are also aware, my wife spoke to you about these two tickets that I had received, which were incorrectly given to me by the police officer. As you know, the signs clearly permitted disabled parking for permit holders. However, the Village failed to remove the meters and police office incorrectly ticketed my car for parking in an area for persons with disabilities and who had a permit. One ticket was taken care of by you. Unfortunately, the second Delinquent Violation Notice sent to you by fax today somehow was not vacated. I thus appreciate your intervention in that matter.

I also enclose a Justice Court, Village of Scarsdale, New York Information/ Appearance ticket which was placed on my car on January 23, 2007 and which is returnable on January 31, 2007.

Mr. Dan Sarnoff
Village of Scarsdale
January 29, 2007
Page 2

As you may remember, when I first brought to your attention the issue of
unavailability of disabled parking spaces for Scarsdale residents (at that time there was
only one disabled parking space) you consulted with the town attorney and advised me
that based upon the population and the law under the Disabilities Act nine spaces should
be made available for disabled residents.

Due to your efforts, disabled spaces were made available in the parking garage.
Subsequently, when the move to the station was made necessitated by the construction
going on in Scarsdale, there were only five parking spaces for disabled persons by the
train station and an additional two parking spaces which require feeding the meter.  On
the occasion that I received the ticket, January 23, 2007, having a court appearance, I
arrived at the Scarsdale station and there were no available permit parking spaces.
Apparently either one of the spaces was illegally occupied or there are more than five
persons in Scarsdale with disability permits who also have permits to park in the
Freightway Garage or at the station.  Since I had no other choice I parked at the disabled
parking with a meter by the station.

I believe that I should not have received a ticket since I had paid for my permit, I
am disabled and I parked at a disabled parking space.  I cannot afford the time to
continually appear at the Scarsdale Justice Court to argue $15 tickets.  If I plead not
guilty I have to waste an entire day.  If I plead guilty with an explanation, most likely I
will be found guilty anyway.  There seems to be inadequate space for people with
disabilities at the Scarsdale station.

If this ticket cannot be vacated I am enclosing a check payable to the order of
Scarsdale Village Court in the amount of $15.00 which I would appreciate your
delivering to the Village court.  However, it is more important that I be able to practice
my profession without unnecessary distractions due to the lack of availability of disabled
permit parking at the station.

You know, of course, it is the duty of the Village of Scarsdale under federal and
state law to accommodate people with disabilities.  You have been most helpful to me in
effectuating the law for the benefit of disabled persons in the Village of Scarsdale.  I
appreciate your efforts on my behalf.  I would hope further that you would be able to
arrange for additional parking spaces for permit holders so that it will not be necessary

Mr. Dan Sarnoff
Village of Scarsdale
January 29, 2007
Page 3


for me to have to write and spend so much time in order to obtain my legal rights and
practice my profession.


Sincerely yours,

Fred Ehrlich

Enclosure
cc. w/encls. Justice Court,
            Village of Scarsdale


*sarnoff vill of scars 012907*
n:\clients\ehrlich\letters\scarsdale-village-042506.doc

CANNED
APRIL 10, 2007

LAW OFFICES OF
# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: 212-370-5244 • FAX: 212-370-9145

OF COUNSEL

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
tedkaplanesq@aol.com

April 10, 2007

EHRLICH & FREEDMAN, P.A.
CORAL SPRINGS FINANCIAL PLAZA
3300 UNIVERSITY DRIVE, SUITE 527
CORAL SPRINGS, FLORIDA 33065
TEL: 954-755-0009
FAX: 954-755-0067

Mr. Dan Sarnoff
Village Manager's Office
Village of Scarsdale
Post and Crane Road
Scarsdale, NY 10583

**Re:   Information/Appearance Ticket #S030001355**

Dear Dan:

Enclosed please find the above-referenced ticket.

The reason I parked where I did was that there was no unmetered parking available for persons with disabilities.  For your ready reference I am enclosing a copy of my letter to you dated January 29, 2007.

Subsequent to the resolution - with your assistance – of the matter of the ticket dated January 23, 2007, on occasion when there has been no space available I have parked at the metered station for disabled persons and have not received a ticket because apparently the ticket issuers were under notice that I was allowed to park there if there was no available parking space at the station for disabled permit holders.

I would therefore appreciate this ticket being cancelled and the traffic agents and police be notified that if there is no available parking for permit holders with disabilities that their cars not be ticketed at meters for disabled persons.

It is apparent that the five spaces are inadequate because they are often filled by other disabled persons.  It is imperative that I utilize a disabled parking space so that I can continue to go to my office or court, etc. in Manhattan.

Mr. Dan Sarnoff
Village Manager's Office
April 10, 2007
Page 2


Please arrange for this ticket to be vacated.

Very truly yours,



Fred Ehrlich

Enclosures
cc. w/encls. Office of the Court Clerk
n:\clients\ehrlich\letters\vill of scars 04 10 07 ticket.doc

LAW OFFICES OF

# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: 212-370-5244 • FAX: 212-370-9145

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
tedkaplanesq@aol.com

June 18, 2007

OF COUNSEL

EHRLICH & FREEDMAN, P.A.
CORAL SPRINGS FINANCIAL PLAZA
3300 UNIVERSITY DRIVE, SUITE 527
CORAL SPRINGS, FLORIDA 33065
TEL: 954-755-0009
FAX: 954-755-0067

*By Facsimile and Mail*

Mr. Dan Sarnoff
Village Manager's Office
Village of Scarsdale
Post and Crane Road
Scarsdale, NY 10583

Re:    **Information/Appearance Ticket #S030001345**

Dear Dan:

Enclosed please find a copy of the above-referenced ticket and a Delinquent Violations Notice dated June 14, 2007 pertaining to it.

Also enclosed are a copy of my letter to you dated April 10, 2007, a copy of Information/Appearance Ticket #S030001355 and a Delinquent Violations Notice dated May 3, 2007 pertaining to both ticket # S030001345 and #S030001355 – both issued the same day, March 27, 2007 - and a letter from the Justice Court dated May 10, 2007 advising that ticket #S030001355 had been dismissed.

I assumed that ticket #S030001345 had also been dismissed.

The reason I parked where I did was that there was no unmetered parking available for disabled permit holders.

I would therefore appreciate this ticket being cancelled and the traffic agents and police be notified that if there is no available parking for permit holders with disabilities that their cars not be ticketed at meters for disabled persons.

It is apparent that the five spaces are inadequate because they are often filled by other disabled persons. As I have advised you in the past, it is imperative that I utilize a disabled parking space so that I can continue to go to my office or court, etc. in Manhattan.

Mr. Dan Sarnoff
Village Manager's Office
June 18, 2007
Page 2


Please arrange for this ticket to be vacated.

Very truly yours,

Fred Ehrlich

Enclosures
cc. Office of the Court Clerk
...\disability parking\vill of scars 06 17 07 ticket.doc

SCANNED
Jun 22 2007

LAW OFFICES OF

# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: (212) 370-5244 • FAX: (212) 370-9145

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
ted@fredehrlichpc.com

OF COUNSEL

THE EHRLICH LAW CENTER, P.A.
CORAL SPRINGS, FLORIDA
TEL: (954) 510-1800
FAX: (954) 510-1001

June 20, 2007

*By Facsimile and Mail*

Mr. Dan Sarnoff
Village Manager's Office
Village of Scarsdale
Post and Crane Road
Scarsdale, NY 10583

**Re:   Information/Appearance Ticket #S030001345**

Dear Dan:

I wrote to you on June 18, 2007, copy enclosed.

I am also enclosing copy of another ticket, #430923, issued June 18, 2007, which I have just received.

As you are aware, pursuant to the Americans for Disability Act there should be nine spaces for disabled parking and there are only five. I would suggest that you add at least one or two more spaces since on some days there is no space and on other days I am able to park at the appropriate spot. In any event, you should instruct parking agents and police officers that they should not give me a violation since I have a permit and I require parking at the meter when there is no space for disabled persons. Hopefully you will be able to add additional spaces to the station so this problem, which requires extensive communication with you, will stop.

Please arrange for this ticket #43093 to also be vacated.

Very truly yours,

Fred Ehrlich

Enclosures
cc. Office of the Court Clerk
   (with original ticket)
...\disability parking\vill of scars 06 20 07 ticket.doc

SCANNED
Jul 26 2007

LAW OFFICES OF

# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: (212) 370-5244 • FAX: (212) 370-9145

OF COUNSEL

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
ted@fredehrlichpc.com

THE EHRLICH LAW CENTER, P.A.
CORAL SPRINGS, FLORIDA
TEL: (954) 510-1800
FAX: (954) 510-1001

July 26, 2007

*By Facsimile and Mail*

Hon. John H. Galloway
Village Justice
Scarsdale Village Court
1001 Post Road
Scarsdale, NY 10583

Dan Sarnoff
Assistant to the Village Manager's
Village of Scarsdale
1001 Post Road
Scarsdale, NY 10583

Re:   **Information/Appearance Ticket #S030001760**

Honorable Sir and Mr. Sarnoff:

I have again received a ticket for parking at a metered parking space for disabled persons at the train station.  A copy of this ticket is enclosed.

As previously stated in many letters to the Village and to the Court, I have been forced on occasion to park at the meter for disabled persons since the spaces allocated for persons with parking permits who are disabled number five.  Occasionally when I arrive at the station all of the five spaces are filled.

I was previously informed by the Court that the Court would no longer excuse the tickets unless the Village Manager gave me a letter authorizing me to park at a meter without paying if the parking spaces for disabled persons at the railroad station are otherwise occupied.  I have been unable to contact the Village Manager and unable to obtain such letter.  I believe upon review of Section 1106.1 of the New York State Building Code, Vol. 19 NYCRR 122.1 and the previous section of the Building Code that Scarsdale must furnish at the railroad station at least nine parking spaces.  See enclosed table.  In addition, under Section 104.1, Scarsdale has an obligation to enforce these provisions.  The correspondence with the Village Manager's office and the Court are voluminous on the subject.

I am planning to go on vacation but if on my return this matter is not finally resolved so I am able to go to work every day without disruption, I will bring a declaratory judgment action against the appropriate authorities to compel the Village and Town to furnish sufficient parking facilities so that I am able to go to work on a regular basis despite my disability.

Hon. John H. Galloway and Mr. Dan Sarnoff
July 26, 2007
Page 2

I am in the office.  If you have any questions please call me.  If not, please advise me by mail as to your intentions.  I simply cannot continue this totally unnecessary correspondence, particularly when I have purchased a permit and am entitled to a disability parking space.

Please note all handicapped parking spaces should be as close as possible to the train station.

Respectfully yours,

Fred Ehrlich

Enclosures

...\disability parking\village ct, sarnoff 07 26 07 parking.doc

# CHAPTER 1
# GENERAL REQUIREMENTS

## SECTION 101
## TITLE, PURPOSE AND SCOPE

**101.1 Title.** These provisions shall be known as the *Building Code of New York State*, and shall be cited as such and will be referred to herein as "this code."

**101.2 Scope.** The provisions of this code shall apply to the construction, alteration, movement enlargement, replacement, repair, equipment, use and occupancy, location, maintenance, removal and demolition of every building or structure or any appurtenances connected or attached to such buildings or structures.

**Exceptions:**

1. Detached one- and two-family dwellings and multiple single family dwellings (townhouses) not more than three stories high with separate means of egress and their accessory structures shall comply with the *Residential Code of New York State.*

2. Agricultural buildings used solely in the raising, growing or storage of agricultural products by a farmer engaged in a farming operation.

3. Electrical equipment used for radio and television transmissions, other than equipment and wiring for power supply.

**101.3 Purpose.** This code is intended to provide minimum requirements to safeguard the public safety, health and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributed to the built environment.

**101.4 Referenced codes.** The other codes listed in Sections 101.4.1 through 101.4.7 and referenced elsewhere in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference.

**101.4.1 Electrical.** The provisions of Chapter 27 of this code shall apply to the installation of electrical systems, including alterations, repairs, replacement, equipment, appliances, fixtures, fittings and appurtenances thereto.

**101.4.2 Gas.** The provisions of the *Fuel Gas Code of New York State* shall apply to the installation of gas piping from the point of delivery, gas appliances and related accessories as covered in this code. These requirements apply to gas piping systems extending from the point of delivery to the inlet connections of appliances and the installation and operation of residential and commercial gas appliances and related accessories.

**101.4.3 Mechanical.** The provisions of the *Mechanical Code of New York State* shall apply to the installations alterations, repairs, and replacement of mechanical systems, including equipment, appliances, fixtures, fittings and/or appurtenances, including ventilating, heating, cooling, air conditioning and refrigeration systems, incinerators, and other energy-related systems.

**101.4.4 Plumbing.** The provisions of the *Plumbing Code of New York State* shall apply to the installation, alteration, repairs and replacement of plumbing systems, including equipment, appliances, fixtures, fittings and appurtenances, and where connected to a water or sewage system and all aspects of a medical gas system.

**101.4.5 Property maintenance.** The provisions of the *Property Maintenance Code of New York State* shall apply to existing structures and premises; equipment, and facilities; light, ventilation, space heating, sanitation, life and fire safety hazards; responsibilities of owners, operators and occupants; and occupancy of existing premises and structures.

**101.4.6 Fire prevention.** The provisions of the *Fire Code of New York State* shall apply to matters affecting or relating to structures, processes and premises from the hazard of fire and explosion arising from the storage, handling or use of structures, materials or devices; from conditions hazardous to life, property or public welfare in the occupancy of structures or premises; and, from the construction, extension, repair, alteration or removal of fire suppression and alarm systems or fire hazards in the structure or on the premise from occupancy or operation.

**101.4.7 Energy.** The provisions of the *Energy Conservation Construction Code of New York State* shall apply to all matters governing the design and construction of buildings for energy efficiency.

**101.4.8 Factory manufactured buildings.** The provisions of 19 NYCRR shall apply to structures wholly or in substantial part manufactured in a manufacturing facility for installation in New York State. Such structures shall be constructed and installed in accordance with the requirements of this code and shall bear Insignia of Approval issued by the Secretary of State that certifies that the structure or component is in compliance with the applicable requirements.

GENERAL REQUIREMENTS

## SECTION 102
## APPLICABILITY

**102.1 General.** Where, in any specific case, different sections of this code specify different materials, methods of construction or other requirements, the most restrictive shall govern. Where there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable.

**102.2 Other laws and regulations.** The provisions of this code shall not be deemed to nullify any provisions of local, state or federal laws and regulations.

**102.3 Application of references.** References to chapter or section numbers, or to provisions not specifically identified by number, shall be construed to refer to such chapter, section or provision of this code.

**102.4 Reference standards.** The standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and reference standards, the provisions of this code shall apply.

**102.5 Appendices.** The following appendices have been adopted and are made part of this code:

Appendix E - Supplemental Accessibility Requirements

Appendix F - Rodent Proofing

Appendix I - Patio Covers

Appendix K - Rehabilitation of Existing Structures

Appendix L - Assistive Listening Systems

**102.6 Partial invalidity.** In the event any part or provision of this code is held to be illegal or void, this shall not have the effect of making void or illegal any of the other parts or provisions.

**102.7 Existing structures.** The legal occupancy of any structure existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, the *Property Maintenance Code of New York State* or the *Fire Code of New York State*.

**R102.8 Stormwater runoff.** Operators of construction sites from which stormwater runoff is discharged to state waters may need first to obtain a State Pollutant Discharge Elimination System (SPDES) permit authorizing such discharge. This usually means acquiring coverage under a SPDES General Construction Activity Stormwater Permit, which requires the operator to implement management practices that are aimed at minimizing pollutants in the discharged runoff. For information concerning SPDES general permit coverage and information on how to manage and reduce pollution associated with stormwater runoff, the operator should contact the New York State Department of Environmental Conservation (DEC) regional office having jurisdiction in the geographical area where the discharge will occur.

## SECTION 103
## OFFICE OF CODE ENFORCEMENT

**103.1 Creation of enforcement agency.** A city, town, village or county that is responsible for administration and enforcement of this code shall designate a code enforcement official in accordance with the applicable provisions of local law.

A state agency that is responsible for administration and enforcement of this code shall be in compliance with the applicable provisions of state agency regulations.

## SECTION 104
## CODE ENFORCEMENT OFFICIAL

**104.1 General.** A city, town, village or county that is responsible for administration and enforcement of this code shall establish its local program in accordance with the applicable provisions of local law.

A state agency that is responsible for administration and enforcement of this code shall be in compliance with the applicable provisions of state agency regulations.

**104.2 and 104.3** Reserved.

**104.4 Inspections.** A city, town, village or county that is responsible for administration and enforcement of this code shall provide for inspections in accordance with the applicable provisions of local law.

A state agency that is responsible for administration and enforcement of this code shall be in compliance with the applicable provisions of state agency regulations.

**104.5 and 104.6** Reserved.

**104.7 Department records.** A city, town, village or county that is responsible for administration and enforcement of this code shall establish and maintain records in accordance with the applicable provisions of local law.

A state agency that is responsible for administration and enforcement of this code shall keep records in compliance with the applicable provisions of state agency regulations.

**104.8** Reserved.

**104.9 Approved materials and equipment.** Materials, equipment and devices determined to be acceptable for use shall be constructed and installed in accordance with such approval.

**104.9.1 Used materials and equipment.** Material, equipment and devices shall not be reused unless they meet the requirements of this code for new materials.

ACCESSIBILITY

## SECTION 1105
## ACCESSIBLE ENTRANCES

**1105.1 Required.** At least 50 percent but not less than one entrance to each building and structure, and each separate tenant space within the building or structure, shall comply with the accessible route provisions of this chapter.

Exceptions:

1. Entrances to spaces not required to be accessible as provided for in Section 1107 or 1108.

2. Loading and service entrances that are not the only entrance to a building or to a tenant space.

**1105.2 Multiple accessible entrances.** Where a building or facility has entrances that normally serve accessible parking facilities, transportation facilities, passenger loading zones, taxi stands, public streets and sidewalks, tunnels or elevated walkways, or accessible interior vertical access, then at least one of the entrances serving each such function shall comply with the accessible route provisions of this chapter.

## SECTION 1106
## PARKING AND PASSENGER
## LOADING FACILITIES

**1106.1 Required.** Where parking is provided, accessible parking spaces in conformance with ICC/ANSI A117.1 shall be provided in compliance with Table 1106.1 except as required by Sections 1106.2 and 1106.3 and except that spaces shall be provided with access aisles at least 8 feet (2440 mm) wide.

**1106.2 Groups R-2 and R-3.** Two percent but not less than one of each type of parking space provided for occupancies in Groups R-2 and R-3, which are required to have Type A or Type B dwelling or sleeping units, shall be accessible. Where parking is provided within or beneath a building, accessible parking spaces shall also be provided within or beneath the building.

**1106.3 Rehabilitation facilities and outpatient physical therapy facilities.** Twenty percent of patient and visitor parking spaces provided at rehabilitation facilities and outpatient physical therapy facilities shall be accessible.

**1106.4 Signage.** Each accessible parking space shall be provided with signage displaying the international symbol of accessibility. Each access aisle shall be provided with signage reading "No Parking Anytime." Signs shall be permanently installed at a clear height of between 60 inches (1525 mm) and 84 inches (2185 mm) above grade and shall not interfere with an accessible route from an access aisle.

TABLE 1106.1
ACCESSIBLE PARKING SPACES

| TOTAL PARKING SPACES PROVIDED | REQUIRED MINIMUM NUMBER OF ACCESSIBLE SPACES |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1,000 | 2% of total |
| More than 1,000 | 20 plus one for each 100 over 1,000 |

**1106.5 Location.** Accessible parking spaces shall be located on the shortest accessible route of travel from adjacent parking to an accessible building entrance. In parking facilities that do not serve a particular building, accessible parking spaces shall be located on the shortest route to an accessible pedestrian entrance to the parking facility. Where buildings have multiple accessible entrances with adjacent parking, accessible parking spaces shall be dispersed and located near the accessible entrances.

Exception: In multilevel parking structures, for every eight or fraction of eight accessible spaces, at least one shall be in a location having a minimum vertical clearance of 98 inches (2490 mm) maintained along the vehicular route connecting the space with a designated entrance and exit. Such spaces are permitted on one level.

**1106.6 Passenger loading zones.** Passenger loading zones shall be designed and constructed in accordance with ICC/ANSI A117.1.

**1106.6.1 Medical facilities.** A passenger loading zone shall be provided at an accessible entrance to licensed medical and long-term care facilities where people receive physical or medical treatment or care and where the period of stay exceeds 24 hours.

**1106.6.2 Valet parking.** A passenger loading zone shall be provided at valet parking services.

TITLE 19 (NYCRR)

CHAPTER XXXIII - STATE FIRE PREVENTION & BUILDING CODE COUNCIL
SUBCHAPTER A - UNIFORM FIRE PREVENTION & BUILDING CODE
PART 1221 - BUILDING CODE

Effective Date 1/1/03

§1221.1 Building code.

Requirements for the construction, alteration, movement, enlargement, replacement, repair,
equipment, use and occupancy, location, maintenance, removal and demolition of a building or
structure or any appurtenance connected or attached to a building or structure are set forth in a
publication entitled Building Code of New York State, publication date: May 2002, published by
the International Conference of Building Officials (ICBO). Provisions specifically addressing
detached one-and two-family dwellings, attached one-family dwellings (townhouses) not more
than three stories in height with a separate means of egress, and their accessory structures are set
forth in the Residential Code of New York State (see Part 1220 of this Title). Copies of the
Building Code of New York State may be obtained from the publisher at the following address:

International Conference of Building Officials
5360 Workman Mill Road
Whittier, CA 90601-2298

Such document is available for public inspection and copying at:
New York State Department of State
Codes Division
41 State Street
Albany, NY 12231-0001

SCANNED
nov. 6 ,20 07

LAW OFFICES OF
# FRED EHRLICH, P.C.

LINCOLN BUILDING • 60 EAST 42ND STREET, 46TH FLOOR • NEW YORK, NY 10165-0006 • TEL: (212) 370-5244 • FAX: (212) 370-9145

FRED EHRLICH
ADMITTED IN NY & FL
ehrlichlaw@aol.com

THEODORE P. KAPLAN
ADMITTED IN NY, NJ & CT
ted@fredehrlichpc.com

OF COUNSEL
THE EHRLICH LAW CENTER, P.A.
CORAL SPRINGS, FLORIDA
TEL: (954) 510-1800
FAX: (954) 510-1001

November 2, 2007

*By Facsimile and Mail*

Hon. John H. Galloway
Village Justice
Scarsdale Village Court
1001 Post Road
Scarsdale, NY 10583

Dan Sarnoff
Assistant to the Village Manager's
Village of Scarsdale
1001 Post Road
Scarsdale, NY 10583

**Re:    Information/Appearance Ticket #S030001760**

Honorable Sir and Mr. Sarnoff:

On July 26, 2007 I again wrote to you, with enclosures, with regard to the above-referenced ticket.  This should have been sufficient to vacate the ticket.  If you cannot vacate the ticket please indicate that I wish to plead not guilty, and set an appropriate date for trial so this matter can be resolved on appeal.

As you are aware, there is simply an inadequate number of parking spaces for disabled persons who have permits.  Since I must go to work, I have no choice but to park at a meter for disabled persons.

Respectfully yours,

Fred Ehrlich

cc. Office of the Court Clerk
    Village Attorney
    ...\disability parking\vill of scars 11 02 07 ticket.doc